The next case, number 22134 and number 22135, Peter Marcus et al. versus American Contract Bridge League. At this time, would Mr. Dinsmore please introduce himself on the record to begin? Good morning, your honors. May it please the court, may I reserve two minutes in rebuttal? Yes, you may. Thank you. Raymond Dinsmore on behalf of the appellants cross appellees. Employers are required to pay overtime wages to employees whose primary duties directly relate to the goods or services that the employer provides. Here, the employer is a company that provides officiated bridge tournaments who fail to pay overtime to the workers who actually directed those tournaments. The question of whether the employer can meet its burden in conclusively proving that these workers are exempt administrators requires application of a relational analysis, a standard that was laid out in this court's recent decision in Walsh v. Unitil. Applying a relational analysis to the facts of this case confirms that the trial court's determination that tournament directors with the rank of tournament director are non-exempt employees, and this is because the primary duties of tournament directors are to officiate bridge tournaments, and the employer is in the business of providing officiated bridge tournaments. ACBL's challenge to this finding on appeal is that the business purpose of ACBL is to grow and sustain the game of bridge rather than to officiate bridge tournaments. But the Unitil decision makes it clear that a company's business purpose or purposes must consider the product or service that the company sells and the goods and services which constitute its marketplace offerings. Given that ACBL receives millions of dollars each year in tournament and tournament director fees, we think it's clear that tournament directors are engaged in production work. And while we agree with the court's analysis with respect to the rank of tournament directors, we think the court erred with respect to other ranks, most notably the ranks of associate national and national tournament director. And in that case, the court determined that associate national and national tournament directors were different because, in part, they managed large tournaments and associated staff. What I think the trial court missed is that associate national and national tournament directors is not a separate job, but a tournament director rank that would allow a tournament director to serve as director in charge of a larger tournament. But the vast majority of time, the national tournament directors and associate national tournament directors, they would not be operating as director in charge of a tournament. Just like other ranks, they're expected to perform 300 tournament sessions per year. As I understand it, the national tournament directors actually have the discretion to fire employees. So there are certain categories. Field supervisor and area manager, I think, are the ranks that have the authority to hire and fire. I think the judge differentiated associate national and national tournament directors based on management of large staff, assisting with the resolution of grievance procedures, updating regulations, and I think there were one or two other points that the trial court identified as distinguishing that rank. So it's only the field supervisors and the associate managers? Area managers. Area managers that have discretion in hiring and firing. That's correct. And so just like the other rank tournament directors, associate national and national tournament directors, they have to work their 300 sessions per year. That's a quota, which means that most of the tournaments that they direct, much or most of the tournaments that they direct are not the large tournaments. They're going to be sectional or regional tournaments in which they're going to be performing the same exact work as any other tournament director, including lower rank tournament directors. The notion that work at large tournaments is somehow qualitatively different from tournament directing at smaller tournaments is false, and it's also directly contradicted by the ACBL's own CEO, who was CEO from 2011 to 2017, who said that work at larger tournaments is the same type of work. It's just a difference in scale. And so here the court relied on an ACBL email that listed supposed competencies that ANT associate national and national tournament director ranks must possess, and they did so as a means of justifying why they should be treated as exempt administrators. We think the court erred in relying on this disputed document and by completely ignoring the other evidence that the work of associate national and national tournament directors were the same as other ranks. For example, the ACBL CEO testified at deposition that the difference between associate national and national tournament directors and the other lower ranks was that national and associate national were held in very high esteem. Area managers... What about, wasn't there testimony or evidence that the national tournament directors also train and mentor other directors, whereas the tournament directors don't do that? Right, and I think that that's an accurate description of what's in the list of competencies. And so how do we classify training and mentoring sound more like managerial-type duties than production? I think maybe more so with training than with mentoring. I think all tournament directors, people with more experience, are going to have an interest in making sure that the people who are following behind them know and understand the game of bridge and are going to be the best tournament directors that they can. I think our point is that however significant that aspect of their job, it pales in comparison to the primary duty of these tournament directors, which is to produce the product that ACBL is in the business of producing. And the court also pointed, I think, towards drafting and updating tournament regulations. Right, and we agree that that is in the job description. Do tournament directors draft regulations, or is that just the national? I don't think there's any evidence that tournament director-ranked tournament directors drafted regulations. Just that the national tournament directors do? I think that's in the list of competencies. So I think what you're telling us, if I'm understanding it correctly, is that as compared to the tournament directors, the national tournament directors and the associational tournament directors do have some duties that sound more like management duties, but you would say they're by no means their primary duties, hence they fall out of the equation ultimately. Correct. I mean, I would dispute that some of the things that have been characterized as administrative duties, such as guiding the appeals resolution process, is actually an administrative duty. The trial court believed that it was, but at the same time acknowledged that that same action performed with the tournament director rank was production work. So I quibble with some of the designations, but I agree that the competency, the email describing the competencies, does reflect some distinction, but there's really no finding in the record concerning the relative importance of these tasks, how much time is spent performing these tasks. We think it's not significant. We think it pales in comparison to the production work. So if there's no finding in the record on the timing, what are we to do with that on appeal? That sounds like a gap in the record for summary judgment purposes. If it were a close case, I would agree, but I think that the evidence is, in my own view, so overwhelming that the vast majority of work that these tournament directors perform is directing a tournament. I mean, they're there. They're selling ticket entries. They're setting up the tables. They're setting up the computer equipment. They're answering questions. They're guiding disputes, and that's the vast majority of work, and it's the vast majority of the work by ACBL's own metric. The only metric of time that the ACBL imposes on its workers is you must direct a sufficient number of tournaments per year. Can I just ask you about one more? I just want to make sure I understand what the facts are or whether there's a dispute effect on this point. The national tournament directors and the associate national tournament directors manage and supervise tournaments. Tournament directors. Do tournament directors manage and supervise tournaments or games? They also manage tournaments. They do the same work. The only real distinction, in our view, is that having the rank of national or associate national tournament director allows you to serve as the, quote, director in charge. So there's typically a director in charge of each tournament, and you need to have a sufficient rank in order to be the director in charge at that particular tournament, but otherwise they're doing the same work. So does the record establish whether at an event like that  only one of whom is the director in charge? The record does more than that. In fact, it establishes that even a part-time tournament director could, in fact, serve as a director in charge. But my question was, what actually happens? Would you have, at a national tournament, would you have one national tournament director who's in charge, or would you have several national tournament directors, one of whom is in charge? My understanding is there's one director in charge, and depending on the tournament, it's either going to be usually a full-time, but on occasion it's been a part-time tournament director who has a sufficient rank in order to fill that role. Well, that then requires us to know in charge of what and or whom, and what does being in charge mean? If in charge means that that person is directing all the other people and managing them, that's in charge of. If in charge just means they're in charge of the tournament, as every tournament has to have someone, where do we look in the record to find out which type of in charge you're talking about? The director in charge deals with questions, appropriate staffing, placement of tables. There's typically, the record shows, about two to ten hours worth of work that a director in charge will put in to prepare for directing a tournament. And then the tournament director is typically the final authority on matters of judgment, like whether something goes to a certain level of appeal or resolving. They're the final arbiter of certain decisions that relate to the tournament. But I think the trial court addressed whether or not serving as the director in charge could be its own exemption, and because workers are not performing this task with any regularity, you might be a director in charge one year, you might not be a director in charge again for quite a while. They're not doing it with sufficient regularity to qualify for the exemption. I've been talking a lot about associate national tournament directors and national tournament directors. I do want to briefly speak on some of the other titles, which include field supervisor, area manager, and mentor. Mentor, in particular, we think is problematic because the mentor position was a job that existed for only about a year. In 2018, all full-time tournament directors were offered this position, and ostensibly came with additional duties, including recruiting new tournament directors, training them, and acting as a buffer between field managers and the tournament directors themselves. Again, similar to the other ranks, these are workers who are spending, we think, the vast majority of their time engaged in the work of production, engaged in the work of directing tournaments, and whatever administrative functions that were assigned to them were both in relative level of importance and time spent and insignificant compared to the production work. I think the most telling factor about how the ACBL values the work of the tournament directors is in the following example. At one point, there was a move to reduce the number of tournament sessions that field supervisors were required to perform in order to clear up time for other duties. That lasted for a short period of time, and eventually, due to budgetary concerns, the ACBL increased that number back to 300 tournament sessions per year, which I think shows how they valued that time and what they consider to be the most important. Thank you. Thank you. Thank you, Counsel. At this time, would Counsel for the Appley Cross Appellant please introduce himself on the record to begin? Good morning. I'm Paul Prather, Litwin-Middleson firm, and I'm pleased to represent the American Contract Ridge League. The District Court made a fundamental error, got most of this case right, but made a fundamental error when the District Court concluded that the tournament directors, the non-management tournament directors, were production employees producing the very product and service of the employer's business, and as argued by Counsel, that is, running tournaments. It was erroneous in two respects. One, it misstates the purpose of the organization, which is to grow and sustain the Gamer Bridge and serve the bridge-related interests of its 160,000 members, but it also misapprehends who actually runs tournaments. The ACBL, as you probably know, is the sanctioning body for duplicate contract bridge in the United States, Canada, Mexico, and Bermuda, and it's undisputed, that purpose is undisputed in the record. To do that, they do a lot of things unrelated to tournaments. There's publishing of handbooks, newsletters, there's marketing, there's education, there's training of teachers, there's a master point system that allows players to compare themselves to one another, somewhat akin to a golf handicap. They draft the rules, as you've heard, related to contract bridge, and so there's a lot of functions unrelated to tournaments themselves. But they do train a certified tournament directors and they do provide tournament directors. But the ACBL only runs three tournaments a year. Three, one, two, three, they're all called the nationals. The rest of the tournaments are run by different organizations. They're run by the sections and the units and by clubs. The record reflects that there's 1,100 regional and sectional tournaments run every year. The record doesn't tell us how many club tournaments are run every year, but there's more than 3,000 clubs. That's reflected in the record. The relationship here is that ACBL assigns to these other organizations tournament directors who come out and run their tournaments. Most of the tournaments are very small, often run by one tournament director. Not a bunch of people show up, but one tournament director shows up and does the job for these sectionals. But it is the units and districts. I'm sorry, I've got the nomenclature wrong. Units and districts and clubs, it's their tournament, it's not ACBL's tournament. ACBL runs less than 1% of all the competitive bridge tournaments in North America every year, so it's not their tournament. They're not in that business. Well, they're in the business of providing, in effect, umpires for the games. They do. And the tournament directors are the umpires. Right. They provide the officials who go out to do this. But the districts and the clubs and the units look to ACBL to provide this service to them and the officials come out and they do certain things. And I'll get to that in a moment, what they do, because that's understated in the opinion by the district judge. But you can look at this two ways. The way that we've argued it mostly in the briefs is that you can see the function of the tournament which is ancillary to the business purpose of growing and sustaining the game in that they go out and they're the face of the ACBL and they're a liaison to the entities that run the tournaments. And it's very analogous, I think, to the relationship between the marketing specialists that were discussed in the right decision, which is decided in the briefing and their relationship with the independent sales agents in the insurance business. I mean, they go out and they deal with a separate organization and they represent the face and the liaison to that separate organization. And by fairly and consistently applying and enforcing the laws of contract bridge, they support the growth and sustain the game. In fact, Matt Colton, who was one of the named plaintiffs in the case below, testified, and this is in the record at the Joint Appendix 432, that by fairly enforcing the laws of tournament bridge, they help it sustain and grow the game. So even the plaintiffs themselves admit that's a fundamental function of why these people are there and that's important to this relationship analysis between the job and the purpose of the organization that you're out dealing with. A second way to look at it, and it didn't treat this as much in the briefing, but in terms of the way we talked about it below, is that you can analyze this, seeing the tournament sponsors as a fashion of customers and the tournament directors are going out to manage this aspect of their business because they show up and what they do and... That argument, though, that they were managing the business of the customers, that wasn't made below, was it? You know, Your Honor, we talked about so many different things with the judge below. But we didn't brief it below. I was looking back for that and it's not briefed, but we talked about the aspect. The facts about it were clearly presented to the district court, but I don't know that in the long, long hearing we had with our district judge that we talked about that specifically. I can't tell you, Your Honor, I have that recollection. But the reality is that they're out managing this aspect of the business. But from either perspective, they're not production employees. They're ancillary to the main purpose of the organization and what they do and I don't know... Tournaments are ancillary to the main purpose. That's really the argument. Tournaments help grow and sustain the game. And the idea is that if you're a bridge player, you go, you enjoy the competition, you work to get your master points, you travel to these various events and you tell your friends and more people come and the game flourishes as a result of having them. What are we to make of... I think the fact that at least a third of the revenue comes from running these tournaments. That's not exactly accurate. In fact, there's two numbers that are in the record. One's revenue numbers from 2017 and one's from 2018. Total revenue of about $17 million and some change in 2018, $16 million and some change. Of that number, about $3 million of it is revenue from tournament directors being paid back by the organizations for these tournament directors to come back. And when you think about all the tournaments and all the expense of getting them out there, I don't know how my client fared in terms of profit and loss and I'm not sure there's anything in the record about that. But it's a fraction of the total revenue but mostly I would suggest a pass-through for the cost of having these folks out there. It's not a for-profit business, Your Honor, and so it's really not fair to analyze it in that sense. Right, but aren't we supposed to look at the products of the business itself? Well, I don't think the regulations necessarily require that. You have to just look at the business. I mean, this isn't a business with a product like a widget. It's a business that provides a service to the game of bridge and to the bridge-related interest of the members. So it's not a, there's nothing being sold, there's nothing being bought and sold in a commercial sense here. So you have to analyze it, I think, a little differently from a traditional business where there's a service or a product that's being bought and sold because that's really not what it is. If we accepted your sort of ancillary relationship test as the sole test here, suppose your client provided card shufflers. They would handle the shuffling of the cards and make sure they're not being marked at any table. You can make the same argument that that's ancillary to the basic purpose, and yet I'd be very surprised if we were to hold that they're exempt employees. I would, too, but the problem doesn't lie in the second prong of the test. The problem then lies in the third prong of the test, and that is, what do they do? And following from our district judge's conclusion of the production, he went on and said, the decisions they make aren't important. He sort of dismissed the decisions as being important, but without, I think, and I blame myself, without maybe a complete understanding of the complexity of what it takes to set up and officiate a competitive duplicate bridge tournament. And as someone who, prior to doing this, knew a little bit about bridge, I've learned a bit as a result, and if you all know this, I apologize, but duplicate bridge is where every table in a session is playing the same hand. So table one plays the hand, and then they move it to another table and the hands rotate about. So part of the determination at the outset is, what hands will be played based on the level of competition that's going to be showing up for the tournament? You want people to be challenged, but you don't want it to be too difficult. You want it to make sense, so you set it up, then you officiate it, and the decisions that they make are very nuanced and discretionary. There's bidding, and so the... But couldn't you say the same thing for umpires at a Little League game? We've got an organization that provides umpires. So I used that analogy with one of the opponents whose testimony I said is like balls and strikes. And the answer was, it's more complicated and we're better at it than major league umpires. So I think it's a lot more complicated than calling balls and strikes, but it is in some sense like that. There is an aspect of it, but it requires a lot more discretion and judgment about things like what was said. You become the investigator. Who said what when? What did it mean? What was the nuances with it? And how do you award points or penalize players for violations of the... I think it's 25 laws, but they're very complicated in terms of how they're rolled out. I think it's probably been a while since you've been in the Little League game. I was once a coach, believe it or not, and I had a great joy to do that. And yes, and to the... And so the importance of it to the bridge playing community is that it needs to be fair, it needs to be understandable, it needs to be done in a civil fashion. But these term directors have the authority to penalize a player, to even eject a player from the game, and they do it. I mean, sometimes people misbehave and they have to go home, just like the Little League umpire sometimes usually sends the parents home, but not the children. But it's the same sort of authority that you have to have a lot of discretion, and so they do have discretion. So would you say the umpires are exempt employees? I don't know, Your Honor. I know that there's a different regulation that applies to Major League umpires and things like that, but I don't know the answer to that question. I know they're exempt. I mean, I don't know whether they're exempt under this regulation or a different one. The Little League umpires are exempt? Well, I don't know about Little League. I only know about Big League umpires. So when I got to be a Little League umpire, I don't recall being paid. I was, I think, a volunteer. But the amount of discretion and judgment that they have to use to handle this, I think fits that third prong, as opposed to the card shuffler. So it's not a rote sort of job. It's a job that requires a great deal of judgment, a great deal of training and experience. And that then leads me into the other part of the argument. And that is the conflation of two concepts by the plaintiffs. In this case, as people grow in experience as tournament directors, they get different ranks. And by rank, you can judge a higher level tournament. Like national rank is a, allows you to be in charge of the NABCs, the National Tournament. And associate is a different level and so forth. And so there's several ranks of tournament directors. A confusion in this case is that at some point, our client created two jobs, national and associate, that had the same title. National and associate director, they're jobs, they're not ranks. And they had job duties. And the data on what those required, and I think you've seen them, is at the Joint Appendix 867, 42 and 43. And they were presented by my co-counsel to Mr. Koldenau in his deposition. And he said, what is this? Is this a job description? And in fact, they were job descriptions. I don't believe, to your question that you asked my opposing counsel, I don't believe they had the authority to hire and fire, or at least not to fire, but they did have the authority to make recommendations. They did train and manage. And when they're running a big tournament, they're supervising everybody. And the big tournaments have literally multiples of people, not only tournament directors, but other kinds of staff working in finance offices and things like that, that work at these tournaments. So they supervise a large number of people and evaluate the number of people. Sorry, I just didn't understand what you just said. So is your position that they can hire and fire? I don't think they can. No matter what their rank? I don't think it's a matter of rank. The job title, national director, I don't think the description says, nor do I think there's any evidence in the record one way or another about this question that they can hire and fire. Now, I will note that in our briefing, we noted that this argument wasn't made by plaintiffs below, but I'm not really standing on that because I believe the judge was right in declaring them to be exempt. Now, I want to come back to one point about the judge below, as I said, got 85% of things right. I think there was an easier path for all of these jobs below than declaring them to be administratively exempt. I think they were clearly exempt under the executive exemption. On page 29 of his opinion, he said, I don't need to reach that, I'm finding them exempt as administrative and I don't need to reach that. But it would have been a simpler analysis because they're all salaried, they're all involved in management, they all manage a defined group of people, they all either have the power to hire and fire or have the ability to recommend and effectively affect people's employment in terms of promotions, other terms and conditions. And so I think, and I'm not going to spend time on this because it's pretty fully briefed and very little response from the plaintiffs on this, the better ruling in my mind would have been to declare those people to be executive exempt employees rather than administrative exempt, but they can be both and I think they probably do meet both tests and in fact under the regulations there's a regulation that says they can be a combination of the two and we didn't, that wasn't really argued below because it wasn't necessary because we felt they met either test rather than a combination. The last point I'd quickly make is that the tournament directors also manage money at the tournaments. I would point you to the resume of Peter Marcus which is in the record which talks at length about money management and there's a number of other places as well. Thank you very much for your time. Thank you, counsel. At this time would Mr. Dinsmore reintroduce himself on the record to begin. He has a two minute rebuttal. Thank you. Good morning, your honor. It's Ray Dinsmore on behalf of Appellants Cross Appellees. The ACBL employs 56 staff members who work out of their home office in Mississippi. Those workers perform a myriad of tasks including things like finance, marketing, working on the newsletter. They employ 160 tournament directors. When we're trying to determine, I know we've been talking about the relational analysis, but if we're talking about the administrative production dichotomy, the question who are the production workers? We think it's clearly the people directing the tournaments. At no point in this case to my recollection has the employer denying that these workers are production workers, but they've never identified who they think the production workers actually are. I think that there's a reason for that because there is nobody else in the business who has the type of hands-on work dealing with the games, dealing with the players, resolving disputes, performing the type of work that is Mr. Prather indicated that at a very large tournament, the national tournament director would manage a whole bunch of people at that event. That's disputed. Our position is if you're a national tournament director who is a director in charge, you're managing people, but if you're a national tournament director, you could be assigned any myriad of tasks. You could be on the services team setting up and doing what everybody else is doing. Your position is yes, if you're a national tournament director, you may on occasion find yourself managing people, but that's not your primary duty because most of the time you're not doing it. That's correct, Your Honor. Unless there are further questions, I would rest. Thank you. Thank you, Counsel. That concludes argument in this case.